1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**SHAMIS & GENTILE P.A.**
Andrew J. Shamis, Esq.
Washington Bar No. 61955
ashamis@shamisgentile.com
14 NE 1st Ave., Suite 705
Miami, Florida 33132
Telephone: 305-479-2299

Counsel for Plaintiff and Proposed Classes

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| DEBBIE DUNCAN individually and on behalf of all others similarly situated,<br><br>      Plaintiff,<br><br>vs.<br><br> PLAYTIKA, LTD an Israeli limited company,<br><br>      Defendant. | Case No.<br><br>**CLASS ACTION COMPLAINT**<br><br><br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

## CLASS ACTION COMPLAINT

Plaintiff, Debbie Duncan ("Plaintiff"), brings this action, individually and on behalf of all others similarily situated, against Defendant Playtika, Ltd., an Israeli limited company ("Playtika" or "Defendant"). Plaintiff makes the following allegations based upon, *inter alia*, the investigation made by her counsel, and based upon information and belief, except as to those allegations specifically pertaining to Plaintiff which are based upon her personal knowledge:

## NATURE OF THE ACTION

1.      This case arises out of Playtika's (1) operation of an illegal gambling game, and (2) unlawful, deceptive, and misleading trade practices (including the use of false advertising and addictive gambling in-game features).

2.      Playtika is a video game company that develops and markets mobile and online games. Playtika is one of the leading developers of "social casino" and "social casual" games. Its products include virtual slot machines, card games, and other casino-themed "games of chance."

3.      Playtika's online slot machines are available to play on Android and Apple iOS devices.

4.      Since 2020, Playtika has generated approximately $12.69 billion.[1] In 2024 alone, Playtika generated revenue of $2.55 billion.[2]

5.      One of Playtika's most popular slot machine games is Slotomania in which users can select from various slot machine games, all of which are games of chance and do not involve any skill.

6.      In Slotomania, Playtika provides consumers with free "coins" that can be used to wager on its slot machine games. After consumers inevitably lose their

---

[1] https://stockanalysis.com/stocks/pltk/revenue/ (last accessed April 7, 2025).

[2] https://finance.yahoo.com/news/playtika-holding-corp-pltk-q4-071712992.html (last accessed April 7, 2025).

initial allotment of coins, Playtika attempts to sell them additional coins, generally starting at $1.99 for 900,000 coins. Without coins, consumers cannot play Playtika online slot machines.

7.    Freshly topped off with additional coins, consumers wager to win more coins. The coins won by consumers playing Playtika's game of chance are identical to the coins that it sells. Thus, by wagering coins that were purchased, consumers have the chance to win additional chips that they otherwise would have to purchase.

8.    In *Kater v. Churchill Downs Inc.*, the Ninth Circuit held that the mobile game *Big Fish Casino* constituted "illegal gambling under Washington law." 886 F.3d 784, 785 (9th Cir. 2018). The Ninth Circuit reached this conclusion, in part, on the basis that the virtual chips offered in Big Fish Casino were things of value because they extended the right of players to play the games in Big Fish Casino. Similarly, the coins in Slotomania are things of value as they extend the right of players to play the games of chance in Slotomania.

9.    However, the legal landscape surrounding social casino games has shifted significantly in recent years, especially with cases like *Kater v. Churchill Downs Inc.* and *Larsen v. PTT, LLC* challenging the notion that these games are free from gambling regulations.

10.    In June 2024, the *Larsen v. PTT, LLC* decision further solidified this line of reasoning.  There, the Washington district court held that a similar social casino app, High 5 Games, engaged in unlawful gambling by allowing its players to wager "virtual coins." *Larsen v. PTT, LLC*, 737 F.Supp.3d 1076, 1087 (W.D. Wash. Jun. 11, 2024).

11.    The court determined these virtual coins were "things of value," being used "to spin the virtual slot games in High 5 Casino and High 5 Vegas[.]" *Larsen*, F.Supp.3d at 1087. The court held that this app constituted "illegal gambling games because the coins are things of value being staked on 'a contest of chance not under

the wagerer's control' [] with the player's understanding that they may win more of the same virtual coins with a successful spin." *Id*. at 1085. This ruling followed the logic in *Kater*, concluding that the virtual coins were staked on games of chance, and that players expected to win more coins through gameplay, which was enough to classify the games as illegal gambling.

12.     Like in *Kater* and *Larsen*, Playtika consumers are staking virtual and real currency to engage in games of chance, such as spinning a slot machine, with the expectation of winning more virtual items or in-game advantages.

13.     Further, to maximize each player's spending in Slotomania, Playtika advertises discounted coin bundles as being discounted or on sale for a limited time. However, these offers are misleading as the coin bundles are never truly discounted and the "limited-time" nature of the sale is false.

14.     Playtika's unfair, deceptive, and unlawful acts or practices of allowing players to pay real-world currency to gamble on winning in-game items, implemented in conjunction with undisclosed false advertising, have deceived, misled, and harmed consumers who comprise a large segment of Playtika's player population. Plaintiff and other consumers, as well as the general public, have been impacted or injured as a result of Playtika's practices, including, but not limited to, having suffered out-of-pocket loss.

15.     By operating its online slot machine, Playtika has violated Washington law and illegally profited from tens of thousands of consumers. Accordingly, Plaintiff, on behalf of herself and the Classes of similarly situated individuals, brings this lawsuit to recover their losses, as well as costs and attorneys' fees.

## PARTIES

16.     Plaintiff Duncan is a natural person and a citizen of the state of Washington and resides in Spokane County, WA.

17.     Defendant Playtika Ltd. is a limited company incorporated and existing under the laws of Israel, with its principal place of business at 8 HaChoshlim Street, Herzliya 4672408, Israel. Playtika Ltd. conducts business throughout this District, Washington State, and the United States.

18.     Unless otherwise indicated, the use of Playtika's name in this Complaint includes all agents, employees, officers, members, directors, heirs, successors, assigns, principals, trustees, sureties, subrogees, representatives, vendors, and insurers of Playtika.

## JURISDICTION AND VENUE

19.     Federal subject-matter jurisdiction exists under 28 U.S.C. § 1332(d)(2) because (a) at least one member of the class is a citizen of a state different from Playtika, (b) the amount in controversy exceeds $5,000,000, exclusive of interests and costs, and (c) none of the exceptions under that subsection apply to this action.

20.     The Court has personal jurisdiction over Playtika because they conduct significant business transactions in this District, and because the wrongful conduct occurred in and emanated from this District.

21.     Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District.

22.     Playtika has purposefully directed its activities toward this District.

23.     Playtika has purposefully availed itself of the privileges of conducting activities in this District.

24.     Playtika's claim arises out and relates to Playtika's forum-related activities.

25.     The exercise of jurisdiction over Playtika is reasonable.

26.     Upon information and belief, Playtika localizes Slotomania for each market where it is distributed, including the United States. This localization includes changes to the language and currency presented in Slotomania.

27.    Upon information and belief, Playtika has sold millions of dollars of virtual items to thousands of Washington residents, most of which are repeat purchases by the same customers, by contracting with the customers to sell virtual coins and other goods in exchange for legal tender.

28.    Slotomania facilitates ongoing economic activity between thousands of Washington players and Playtika.

29.    Upon information and belief, Playtika directly controls whether consumers in Washington can complete purchases from Slotomania.

30.    Upon information and belief, Playtika has the capability to determine where its customers are from, including whether purchases are being made from Washington.

31.    Upon information and belief, Playtika has the capability to prevent Washington residents from completing purchases or placing wagers in Slotomania, but has chosen to accept those purchases and wagers from Washington residents. For example, other gambling applications prevent transactions from residents of states where gambling is unlawful.

32.    Upon information and belief, Playtika has taken no steps to restrict Washington residents' access to Slotomania or to restrict the ability of Washington residents to make purchases from Slotomania.

33.    Playtika aggressively advertises Slotomania in the United States, including targeted advertisements in this District. Those advertisements include linear media, social media advertisements and advertisements in other mobile applications.

34.    Upon information and belief, Playtika has the capability of targeting its Slotomania advertisements by geography and the capability of excluding residents of Washington from the reach of Playtika's advertisements for Slotomania.

35.     Upon information and belief, Playtika has taken no steps to restrict their advertisements for Slotomania from reaching residents of Washington.

36.     Plaintiff alleges, upon information and belief, that Playtika conducts professional and commercial activities in Washington on a substantial, continuous, and systematic basis and therefore Playtika is subject to the general jurisdiction of the courts of this state.

37.     Plaintiff further alleges, upon information and belief, that the claims asserted in this complaint arise out of or are related to Playtika's professional and commercial activities within Washington, and therefore Playtika is subject to the specific jurisdiction of the courts of this state.

## COMMON FACTUAL ALLEGATIONS

### I.      Free-to-Play and the New Era of Online Gambling

38.     The proliferation of internet-connected mobile devices has led to the growth of what are known in the industry as "free-to-play" videogames. The term is a misnomer. It refers to a model by which the initial download of the game is free, but companies reap huge profits by selling thousands of "in-app" items that start at $0.99 (purchases known as "micro-transactions" or "in-app purchases").

39.     The in-app purchase model has become particularly attractive to developers of games of chance (e.g., poker, blackjack, and slot machine mobile videogames, amongst others), because it allows them to generate huge profits. In 2023, free-to-play games of chance generated over $7.39 billion in worldwide revenue, and they are expected to grow by at least 8% percent annually.[3]

---

[3]     https://www.prnewswire.com/news-releases/social-casino-global-market-report-2024-2028-and-2033-in-app-purchases-and-monetization-strategies-fueling-growth-302086603.html#:~:text=The%20global%20social%20casino%20market,(CAGR)%20of%208.1%25 (last visited April 1, 2025).

40.     With games of chance that employ the in-game purchase strategy, developers have begun exploiting the same psychological triggers as casino operators. As one respected videogame publication put it:

> "If you hand someone a closed box full of promised goodies, many will happily pay you for the crowbar to crack it open. The tremendous power of small random packs of goodies has long been known to the creators of physical collectible card games and companies that made football stickers a decade ago. For some … the allure of a closed box full of goodies is too powerful to resist. Whatever the worth of the randomised [sic] prizes inside, the offer of a free chest and the option to buy a key will make a small fortune out of these personalities. For those that like to gamble, these crates often offer a small chance of an ultra-rare item."[4]

41.     Another stated:

> "Games may influence 'feelings of pleasure and reward,' but this is an addiction to the games themselves; micro-transactions play to a different kind of addiction that has existed long before video games existed, more specifically, an addiction similar to that which you could develop in casinos and betting shops."[5]

42.     The comparison to casinos doesn't end there. Just as with casino operators, mobile game developers rely on a small portion of their players to provide the majority of their profits. These "whales," as they're known in casino parlance, account for just "0.15% of players" but provide "over 50% of mobile game revenue."[6]

---

[4]     PC Gamer, *Microtransactions: the good, the bad and the ugly*, http://www.pcgamer.com/microtransactions-the-good-the-bad-and-the-ugly/ (last visited April 1, 2025).

[5]     The Badger, *Are micro-transactions ruining video games? | The Badger*, http://thebadgeronline.com/2014/11/micro-transactions-ruining-video-games/ (last visited April 1, 2025).

[6] *Id.* (emphasis added)

43.    Academics have also studied the socioeconomic effect games that rely on in-app purchases have on consumers. In one study, the authors compiled several sources analyzing so called free-to-play games of chance (called "casino" games below) and stated that:

> "[Researchers] found that [free-to-play] casino gamers share many similar sociodemographic characteristics (e.g., employment, education, income) with online gamblers. Given these similarities, it is perhaps not surprising that a (name) predictor of online gambling is engagement in [free-to-play] casino games. Putting a dark line under these findings, over half (58.3%) of disordered gamblers who were seeking treatment stated that social casino games were their first experiences with gambling."
>
> …
>
> "According to [another study], the purchase of virtual credits or virtual items makes the activity of [free-to-play] casino gaming more similar to gambling. Thus, micro-transactions may be a crucial predictor in the migration to online gambling, as these players have now crossed a line by paying to engage in these activities. Although, [sic] only 1–5% of [free-to-play] casino gamers make microtransactions, those who purchase virtual credits spend an average of $78. Despite the limited numbers of social casino gamers purchasing virtual credits, revenues from micro-transactions account for 60 % of all [free-to-play] casino gaming revenue. Thus, a significant amount of revenue is based on players' desire to purchase virtual credits above and beyond what is provided to the player in seed credits."[7]

44.    The same authors looked at the link between playing free-to-play games of chance and gambling in casinos. They stated that "prior research indicated that winning large sums of virtual credits on social casino gaming sites was a key reason for [consumers'] migration to online gambling," yet the largest predictor that a

---

[7] Hyoun S. Kim, Michael J. A. Wohl, *et al.*, *Do Social Casino Gamers Migrate to Online Gambling? An Assessment of Migration Rate and Potential Predictors*, Journal of gambling studies / co-sponsored by the National Council on Problem Gambling and Institute for the Study of Gambling and Commercial Gaming (Nov. 14, 2014), available at http://link.springer.com/content/pdf/10.1007%2Fs10899-014-9511-0.pdf (citations omitted).

consumer will transition to online gambling was "micro-transaction engagement."[8] In fact, "the odds of migration to online gambling were approximately eight times greater among people who made micro-transactions on [free-to-play] casino games compared to [free-to-play] casino gamers who did not make micro-transactions." *Id.*

45.     The similarity between micro-transaction based games of chance and games of chance found in casinos has caused governments across the world to intervene to limit their availability.[9] Historically, such games have eluded regulation in the United States. As a result, and as described below, Playtika's online slot machine games have thrived and thousands of consumers have spent millions of dollars unwittingly playing Playtika's unlawful games of chance.

## II.     A Brief Introduction to Playtika

46.     In December 2010, Playtika launched an online casino game called Slotomania. Over the years, Playtika expanded its online casino game offering and developed a host of online slot machine games including, *inter alia*, Slotomania.

47.     Playtika has been through a series of mergers and acquisitions by some the largest social gaming companies and casinos. In 2011, Caesars Interactive Entertainment—one of the largest online, mobile, and social gaming companies with long ties to traditional casino gaming—purchased Playtika. Later in 2016, Giant

---

[8] *Id.* (emphasis added).

[9] In late August 2014, South Korea began regulating "social gambling" games, including games similar to Playtika's, by "ban[ning] all financial transactions directed" to the games. PokerNews.com, *Korea Shuts Down All Facebook Games In Attempt To Regulate Social Gambling | PokerNews*, https://www.pokernews.com/news/2014/09/korea-shuts-down-facebook-games-19204.htm (last visited April 1, 2025). Similarly, "the Maltese Lotteries and Gambling Authority (LGA) invited the national Parliament to regulate all digital games with prizes by the end of 2014." *Id.*

Interactive Group acquired Playtika and its entire offering of casino games for $4.4 billion.[10]

48.    Playtika has made large profits through their online gambling games. The revenue Playtika receives from Playtika's online casino games are the result of operating unlawful games of chance camouflaged as innocuous videogames.

### III.    Playtika's Slotomania Gambling Gameplay

49.    As explained above, Playtika owns and operates a host of online slot machine games. Each game functions in a substantially similar fashion. That is, consumers purchase and wage real money on games of chance.

50.    Playtika employs unlawful, deceptive, and misleading trade practices (dark patterns and addictive gambling in-game features) in order to further its' own profits.

### A. Playtika's Gambling Features are illegal

51.    Consumers visiting Slotomania's online casino for the first time are awarded a bundle of coins. For example, Playtika gives away 1,000,000 "coins" to new Slotomania players. These free sample coins offer a taste of gambling and are designed to encourage players to get hooked and buy more coins for real money.

52.    After they begin playing, consumers quickly lose their initial allotment coins. Immediately thereafter, Playtika informs them via a "pop up" screen that they have insufficient coins to place a wager. *See e.g.*, <u>Figures 1 and 2</u>. Once players run out of their allotment of free coins, they cannot continue to play the game without buying more coins using real money.

---

[10]    *China's Giant leads consortium to buy Playtika for $4.4 billion*, Game Beat, https://venturebeat.com/2016/07/30/chinas-giant-leads-consortium-to-buy-playtika-for-4-4-billion/ (last visited April 1, 2025).



(**Figure 1**, Slotomania link to store when out of coins)

53.     Concurrently with that warning, Playtika provides a link to consumers, allowing them to purchase coins with real money at its electronic store. Playtika's Slotomania online casino, for example, sells coins from $2 for 900,000 coins to $50 for 158,220,000 coins. *See* Figure 2.



(**Figure 2**, showing Playtika's Slotomania coin prices)

54.     The decision to sell coins by the thousands isn't an accident. Rather, Playtika attempts to lower the perceived cost of the coins (costing just a fraction of a penny per coin) while simultaneously maximizing the value of the award (awarding millions of coins in jackpots), further inducing consumers to bet on its games.

55.     To begin wagering, players select the "BET/LINE" (*i.e.,* bet per played line) that will be used for a spin, as illustrated in <u>Figure 3</u>. Playtika allows players to multiply their bet by changing the number of "lines" (*i.e.,* combinations) on which the consumer can win, shown in <u>Figure 3</u> as the "LINE" button.



(**<u>Figure 3,</u>** showing Slotomania's bet line)

56.     The bet amount multiplied by the number of lines comprises the "Total Bet" shown in <u>Figure 3</u>. Thus, in the example shown in <u>Figure 3</u>, the player is attempting to bet 80,000 coins, or approximately $0.09, for one spin of the slot machine.

57.     Once a consumer spins the slot machine by pressing the "SPIN" button, Playtika does not allow (or call for) any additional user action by the player on any of its slot machine games. Instead, the consumer's computer or mobile device communicates with and sends information (such as the "Total Bet" amount) to Playtika's servers. Playtika's servers then execute the game's algorithms that determine the spin's outcome. Notably, none of Playtika's games depend on any amount of skill to determine their outcomes—all outcomes are based entirely on chance.

58.     Consumers can continue playing with the coins that they won, or they can exit the game and return at a later time to play because Playtika maintains win and loss records and account balances for each consumer. Indeed, once Playtika's algorithms determine the outcome of a spin and Playtika displays the outcome to the consumer, it adjusts the consumer's account balance. Playtika keeps records of each wager, outcome, win, and loss for every player.

59.    Consumers are rewarded for continuing play by leveling up and earning new rewards (*i.e.*, status tiers, coin prizes, and discounted prices). Consumers gain XP with each additional spin and level up, as illustrated in <u>Figures 4 and 5</u>, which show the XP needed to move along to the next status tier and earn a coin prize.



(**<u>Figure 4</u>**, showing Playtika's Slotomania XP level up)



(**<u>Figure 5</u>**, showing Playtika's Slotomania "Level Road")

**B. Playtika Implements Unlawful Deceptive or Dark Patterns, Including Urgency Tactics and False Advertising**

60.    Dark patterns are online user interfaces that are, amongst other reasons, intended to achieve a financial goal for those who implement them by manipulating

users into taking certain actions or making certain decisions against their own interests.[11]

61.    Dark patterns are undisclosed and work by exploiting cognitive biases, and "often employ strategies that render the ease of selecting different options asymmetric, cover up the mechanisms by which consumers are influenced, deceive users through acts or omissions, hide relevant information, or restrict choices likely to be popular among consumers."[12]

62.    The term "dark patterns" was coined to convey the unscrupulous nature of such design elements "and also the fact that [they] can be shadowy and hard to pin down."[13]

63.    The FTC has provided some concrete examples of "dark patterns" deemed deceptive.[14] This includes several specific dark patterns found in Playtika's online casino games and detailed below with specific examples.

64.    The FTC considers dark patterns to be "unfair or deceptive" business practices under Section 5 of the FTC Act, and a September 2022 FTC Staff Report

---

[11] Jamie Luguri, Lior Jacob Strahilevitz, *Shining a Light on Dark Patterns*, 13 J. Legal Analysis, Issue 1, 2021, Pages 43–109, https://doi.org/10.1093/jla/laaa006.

[12] *Id*. (citing Mathur, Arunesh, Jonathan Mayer, and Mihir Kshirsagar. *What Makes a Dark Pattern.. Dark?* Design Attributes, Normative Considerations, and Measurement Methods, ACM Conference on Human Factors in Computing Systems. 2021 (available at https://dl.acm.org/doi/10.1145/3411764.3445610).

[13] Harry Brignull, *Bringing Dark Patterns to Light*, MEDIUM (June 6, 2021), https://harrybr.medium.com/bringing-dark-patterns-to-light-d86f24224ebf (last accessed August 19, 2024).

[14] FTC Staff Report, *Bringing Dark Patters to Light* (September, 2022) (available at: https://www.ftc.gov/system/files/ftc_gov/pdf/P214800%20Dark%20Patterns%20Report%209.1. 2022%20-%20FINAL.pdf ).

titled "Bringing Dark Patters to Light"[15] made clear that "these practices are squarely on the FTC's radar."

### i. *Deceptive Pattern # 1 – Scarcity/Urgency*

65.    Playtika uses "urgency" and "scarcity" tactics in its advertising to induce players to make in-app purchases. These dark patterns are designed to pressure players into purchases by representing demand is high or time is running out when it is not.

66.    Playtika uses these tactics to pressure players into making countless microtransactions to access the incremental resources needed at the time to reach the next level, as illustrated in Figures 6 and 7.



(**Figure 6**, Playtika's Slotomania "Coin Shuffle")



(**Figure 7**, Playtika's Slotomania limited time coin offer).

---

[15] *Id.*

### ii. *Deceptive Pattern #2 – False Reference Pricing Scheme*

67.    Aware of the intertwined connection between consumers' buying decision processes and price, Playtika relies on deceptive "discounted" pricing advertisements for Coins within its' online casino.

68.    False reference pricing occurs when a seller fabricates a false "original" price for a product and then offers that product at a substantially lower price under the guise of a discount. The resulting artificial price disparity misleads consumers into believing the product they are buying has a higher market value, and it induces them into purchasing the product. This practice artificially inflates the true market price for these products by raising consumers' internal reference price and in turn the perceived value consumers ascribe to these products (i.e., demand). Consequently, false reference pricing schemes enable companies, like Playtika, to sell products above their true market price and value, leaving consumers to pay the inflated price regardless of what they thought of the purported discount. Consumers are thus damaged not only by not receiving the promised discount, but by paying a premium the products would not have commanded but for the false reference pricing scheme.

69.    For example, Slotomania's in-game shop displays "Coins" at an advertised price with a percentage discount indicating, *e.g.*, "100% More," as illustrated in Figure 8.

(**Figure 8**, Playtika's Slotomania store)

70.    The advertisements above are presented with a strikethrough that suggest that the packages of Coins were formerly offered at a higher price (or at a lesser value) but is now heavily discounted. Of course, the larger the bundle purchase, the more "value" the consumer receives (*i.e.* +79,110,000 Extra Coins if the consumer is willing to spend $49.99).

71.    However, these bundles were in fact never offered at the lower price or better value suggested by the "discount" during the normal course of business or are never worth that amount. In fact, the "market" price associated with the Coins offered in these packs are arbitrarily created by Playtika. This is evidenced by Playtika's pricing of Coins when a player runs out, which routinely fluctuates and is never consistently proportionate to the amount offered for sale.

72.    As such, the purported "discount" or "sale" packs have no correlation to a uniform market price ever offered for a consistent period of time and are simply advertised as such to induce purchases. Simply put, this pricing scheme is misleading because the savings advertised on its website do not represent the actual savings customers receive, as Plaintiff and reasonable consumers understand that term.

73.    The use of these sale and discount stickers to imply there is a greater value than being received has the capacity to deceive consumers. Further, the utility of using these sales tactics is outweighed by the deception and harm caused to consumers.

74.    Playtika's use of false reference pricing scheme provides it with an unfair advantage, as consumers use pricing and the perception of value to make purchasing decisions. This is because a product's price is used as an indicator of the product's quality.[16]    The term "% more," especially when accompanied by a strikethrough, can and does reasonably signify to consumers a former price because former price representations—as shown above in the myriad academic literature covering the topic—are representations of the products' *value*.

75.    The FTC's Guide Against Deceptive Pricing provides: "[Retailers] should not offer an advance sale under circumstances where they do not in good faith expect to increase the price at a later date, or make a "limited" offer which, in fact, is not limited. In all of these situations, as well as in others too numerous to mention, advertisers should make certain that the bargain offer is genuine and truthful." 16 C.F.R. § 233.5. The Federal Trade Commission ("FTC") also prohibits "unfair or deceptive acts or practices in or affecting commerce." 15 U.S.C. § 45(a)(1). Under FTC regulations, false former pricing schemes, similar to those employed by Playtika are deceptive practices that would violate the FTC Act:

> (a) One of the most commonly used forms of bargain advertising is to offer a reduction from the advertiser's own former price for an article. If the former price is the actual, bona fide price at which the article was

---

[16] Grewal, Dhruv, and Larry D. Compeau. "Comparative price advertising: Informative or deceptive?" *Journal of Public Policy & Marketing* (1992): 52-62, p. 54. Also see Thaler, Richard. "Mental Accounting and Consumer Choice." *Marketing Science* 4, no. 3 (1985): 199-214, p. 212 ("The [reference price] will be more successful as a reference price the less often the good is purchased. The [reference price] is most likely to serve as a proxy for quality when the consumer has trouble determining quality in other ways (such as by inspection)").

offered to the public on a regular basis for a reasonably substantial period of time, it provides a legitimate basis for the advertising of a price comparison. Where the former price is genuine, the bargain being advertised is a true one. If, on the other hand, the former price being advertised is not bona fide but fictitious—for example, where an artificial, inflated price was established for the purpose of enabling the subsequent offer of a large reduction—the "bargain" being advertised is a false one; the purchaser is not receiving the unusual value he expects.

(b) A former price is not necessarily fictitious merely because no sales at the advertised price were made. The advertiser should be especially careful, however, in such a case, that the price is one at which the product was openly and actively offered for sale, for a reasonably substantial period of time, in the recent, regular course of her business, honestly and in good faith – and, of course, not for the purpose of establishing a fictitious higher price on which a deceptive comparison might be based.

### iii. *Deceptive Pattern # 3: False Advertising*

76.     Playtika falsely advertises sales. Specifically, Playtika presents users with purportedly limited time "sales" or "deals" on in-game items. Players reasonably understand the term "sale" or "deal" in this context to mean that a special offer or discount is being offered. Players reasonably understand that the sale being offered is of limited duration and availability. For example, as shown below, Playtika presents users, including Plaintiff, with advertised sale "deals" that have limited time durations, accompanied by a timer.

77.     Despite communicating that the offer is of a special value and will be available for only a limited duration, in reality, Playtika offers the same or substantially similar such "sales" continuously or almost continuously. For example, soon after the "sale" expires, the same or substantially similar sale is presented again in Playtika, again having a countdown timer, or the user may be presented with another similar pop up.

78.     In so doing, Playtika further manipulates users into spending money in Playtika by creating the false impression that users are receiving a unique value.

79.     The false perception of a fleeting sale causes players to make impulse purchases in Playtika.

80.     Playtika's false and misleading advertisements further constitutes unfair competition.

81.     The use of countdown timers in connection with sale offers in Playtika has the capacity to deceive consumers. Further, the utility of using these countdown timers is outweighed by the deception and harm caused to consumers. Playtika could reasonably offer in-game purchases in Slotomania without the use of deceptive countdown timers. On information and belief, the primary purpose and effect of the

use of deceptive countdown timers in  in connection with misleading sale offers is to trick users into making purchases and not to benefit consumers. Playtika is in possession of more relevant information related to its practices, sales prices, and discounts.

82.    On information and belief, without Court intervention, Playtika will continue to publish mobile games that engage in unlawful gambling and unfair competition intended to induce consumers to make purchases.

## FACTS SPECIFIC TO PLAINTIFF

***Plaintiff Debbie Duncan's Experience***

83.     Plaintiff played Slotomania from approximately 2011 through October 2024, during which she made many in-game purchases.

84.    Plaintiff downloaded Slotomania from her residence in Washington. After losing her initial allocation of free coins, she began purchasing coins from Playtika and did so from Washington, which Playtika accepted.

85.    Plaintiff placed all of her wagers in Slotomania in Washington.

86.    Plaintiff wagered tens of thousands of dollars in real-world currency during her time playing Slotomania's slot games. She lost the coins she purchased from Playtika by wagering them in Slotomania's slot games.

87.    By and through Slotomania's gambling features described above, during the time period of 2011 through early October 2024, Plaintiff was induced into making certain in-game purchases that she otherwise would not have made.

88.    During her time playing from 2011-October 2024, Plaintiff viewed sales advertisements substantially similar to that depicted above in Paragraphs 68-80 and reasonably understood that the sale and special offers with timers were of a unique value and would be available for only a limited time. She reasonably relied on this understanding in making one or more of her purchase decisions during 2024,

including (but not limited to) various coin packages in October 2024 as detailed in her receipts.

89. As a result of Playtika's unfair, unlawful, and deceptive acts, Plaintiff and the other putative class members were damaged and induced into making in-game purchases they otherwise would not have made.

90. As a result of Playtika's unfair, unlawful, and deceptive acts, Playtika was unjust enriched.

91. Plaintiff enjoys playing online games and has an ongoing interest in playing Slotomania if it were to change to be devoid of unlawful, deceptive and unfair business practices. Plaintiff therefore has an ongoing interest in Slotomania complying with state and federal gambling laws and consumer protection statutes.

92. In or around October 2024, Playtika updated its December 1, 2023 Terms of Service (which contained a provision to arbitrate disputes in the American Arbitration Association, "AAA") to include new provisions for arbitrating disputes with JAMS, along with corresponding onerous "Mass Arbitration Rules."

93. Among these new updates, in Section 17(c) of its new terms, Playtika provided its customers with a provision to opt out from the agreement to arbitrate within thirty (30) days of first accepting these new terms.

94. Accordingly, on October 30, 2024, Plaintiff (along with 448 other individuals) properly exercised their right to opt out from the agreement to arbitrate and provided notice to Playtika.

95. Plaintiff and these other 448 individuals initiated arbitration with AAA in or around January 2025.

96. However, Playtika refused to participate in the AAA arbitrations leading AAA to close the matter on or around March 11, 2025. Accordingly, this matter is ripe for proceeding before this Court.

## CLASS ALLEGATIONS

85.     Plaintiff brings this case as a class action pursuant to Fed. R. Civ. P. 23, on behalf of herself and all others similarly situated defined as follows:

**86.**     The Classes are defined as follows:

**National Class:** All persons who, during the applicable limitations period, purchased virtual casino chips in Slotomania, opted out of Playtika's current arbitration agreement, attempted to pursue arbitration under the prior version, and Playtika refused to arbitrate.

**National Non-Arbitration Class:** All persons who, during the applicable limitations period, purchased virtual casino chips in Slotomania.

**Washington Sub-Class:** All persons in Washington who, during the applicable limitations period, purchased virtual casino chips in Slotomania, opted out of Playtika's current arbitration agreement, attempted to pursue arbitration under the prior version, and Playtika refused to arbitrate.

**Washington Non-Arbitration Sub-Class:** All persons in Washington who, during the applicable limitations period, purchased virtual casino chips in Slotomania.

87.     Collectively, the National Class, the National Non-Arbitration Class, the Washington Sub-Class, and the Washington Non-Arbitration Sub-Class shall be referred to as the "Classes."

88.     **Adequacy.** Plaintiff will fairly and adequately represent and protect the interests of the other members of the Classes. Plaintiff has retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiff and her counsel are committed to vigorously prosecuting this action on behalf of the other Class members and have the financial resources to do so. Neither Plaintiff nor her counsel have any interest adverse to those of the other members of the Classes.

89.     **Predominance & Superiority.** Absent a class action, most Class members would find the cost of litigating their claims to be prohibitive and would

have no effective remedy. The class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation in that it conserves the resources of the courts and the litigants, and promotes consistency and efficiency of adjudication.

90.    **Final Declaratory or Injunctive Relief.** Playtika has acted and failed to act on grounds generally applicable to the Plaintiff and the Class members, requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class members, and making injunctive or corresponding declaratory relief appropriate for the Classes as a whole.

91.    **Typicality.** The factual and legal basis of Playtika's liability to Plaintiff and to the other Class members are the same, resulting in injury to the Plaintiff and to all of the other members of the Classes. Plaintiff and the other members of the Class have suffered harm and damages due to Playtika's unlawful and wrongful conduct. Accordingly, Plaintiff's claims are typical of the claims of the Classes.

92.    **Numerosity.** Upon information and belief, there are hundreds, if not thousands, of Class members, so joinder of all members is impracticable. The precise number of class members and their identifies are unknown to Plaintiff currently but may be ascertained from Playtika's books and records and other third-party sources.

93.    **Commonality.** There are many questions of law and fact common to the claims of Plaintiff and the other members of the Classes, and those questions predominate over any questions that may affect individual members of the Classes. Common questions for the Classes include, but are not limited to, the following:

    a.  Whether the games in Slotomania are gambling as defined under Washington law;

    b.  Whether Playtika engaged in the conduct alleged in the Complaint;

    c.  Whether Playtika violated the statutes listed below in Counts I - II;

d.  Whether Playtika's unfair or deceptive act or practice of using undisclosed urgency tactics to steer players towards making in-game purchases in its' online casino was unfair or deceptive to a reasonable consumer;

e.  Whether Playtika engaged in false advertising and whether such techniques were deceptive to a reasonable consumer;

f.  Whether Plaintiff and the other Class members were damaged by Playtika's conduct; and

g.  Whether Plaintiff and the other Class members are entitled to restitution or other relief.

### FIRST CAUSE OF ACTION
**Violation of Revised Code of Washington §4.24.070**
**(On behalf of Plaintiff, Washington Sub-Class and Washington Non-Arbitration Sub-Class)**

94.  Plaintiff repeats, realleges, and incorporates the allegations in Paragraphs 1–93 by reference as if fully set forth herein.

95.  Plaintiff, members of the Washington Class, and Playtika are all "persons" as defined by RCW § 9.46.0289.

96.  Washington's "Recovery of money lost at gambling" statute, RCW 4.24.070, provides that "all persons losing money or anything of value at or on any illegal gambling games shall have a cause of action to recover from the dealer or player winning, or from the proprietor for whose benefit such game was played or dealt, or such money or things of value won, the amount of the money or the value of the thing so lost."

97.  "Gambling," defined by RCW § 9.46.0237, "means staking or risking something of value upon the outcome of a contest of chance or a future contingent event not under the person's control or influence."

98.    Coins sold for use in Playtika's online casino are "thing[s] of value" under RCW § 9.46.0285.

99.    Slotomania is an illegal gambling game because it is an online game at which players wager things of value (coins) and by an element of chance (e.g., a random slot machine spin) are able to obtain additional entertainment and extend gameplay (by winning additional coins).

100.    Playtika is the proprietor for whose benefit Slotomania are played because it owns Slotomania and operates it for Playtika's profit.

101.    Plaintiff and the Washington Class gambled when they purchased coins to obtain additional gameplay and more coins to wager in Playtika's Slotomania game. Plaintiff and each member of the Washington Class staked money, in the form of coins, at Playtika's game of chance for the chance of winning additional things of value (e.g., coins that extend gameplay without additional charge).

102.    In addition, Slotomania is not an "pinball machine or similar mechanical amusement device[s]" as contemplated by the statute because: a. the game is electronic rather than mechanical; b. the games confer replays but they are recorded and can be redeemed on separate occasions (i.e., they are not "immediate and unrecorded"); and c. the games contain electronic mechanisms that vary the chance of winning free games or the number of free games which may be won (e.g., the games alter the odds of winning levels).

103.    RCW § 9.46.0285 states that a "'Thing of value,' as used in this chapter, means any money or property, any token, object or article exchangeable for money or property, or any form of credit or promise, directly or indirectly, contemplating transfer of money or property or of any interest therein, or involving extension of a service, entertainment or a privilege of playing at a game or scheme without charge."

104.    The "coins" Plaintiff and members of the Washington Class had the chance of winning in Playtika's online slot machine game are "thing[s] of value"

under Washington law because they are credits that involve the extension of entertainment and a privilege of playing a game without charge.

105.    Slotomania is a "Contest of chance," as defined by RCW § 9.46.0225, because it is "contest[s], game[s], gaming scheme[s], or gaming device[s] in which the outcome[s] depend[] in a material degree upon an element of chance, notwithstanding that skill of the contestants may also be a factor therein." The game is programmed to have outcomes that are determined to a material degree upon chance, notwithstanding that skill of the players may also be a factor therein.

106.    In addition, Playtika's slot machine game is not "Amusement games" as defined by RCW § 9.46.0201 because: a. The outcome does not depend in a material degree upon the skill of the contestant; b. Merchandise is not the only prize awarded; c. The outcome is in the control of the operator, Playtika.

107.    As a direct and proximate result of Playtika's gambling game, Plaintiff and each member of the Washington Class have lost money wagering at Playtika's game of chance. Plaintiff, on behalf of herself and the Washington Class, seek to recover all lost monies, interest, and reasonably attorneys' fees, expenses, and costs to the extent allowable.

**SECOND CAUSE OF ACTION**
**Violations of the Washington Consumer Protection Act**
**(Wash Rev. Code §§ 19.86.010, *et seq.***
**(On behalf of Plaintiff, Washington Sub-Class and Washington Non-Arbitration Sub-Class)**

108.    Plaintiff hereby incorporate the above allegations in paragraphs 1 through 93 as though fully set forth herein.

109.    The Washington Consumer Protection Act ("WCPA") broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code § 19.86.010.

110.    Playtika engaged in the omissions or otherwise committed the acts complained of herein in the course of "trade" or "commerce" within the meaning of Wash. Rev. Code § 19.86.010 as Playtika received payments from Plaintiff Duncan and the other members of the Washington Class in Washington state, and designed, managed, and deployed its online slot machine games from Washington state.

111.    Playtika violated RCW § 9.46.010, *et seq*. which declares that: "The public policy of the state of Washington on gambling is to keep the criminal element out of gambling and to promote the social welfare of the people by limiting the nature and scope of gambling activities and by strict regulation and control. It is hereby declared to be the policy of the legislature, recognizing the close relationship between professional gambling and organized crime, to restrain all persons from seeking profit from professional gambling activities in this state; to restrain all persons from patronizing such professional gambling activities; to safeguard the public against the evils induced by common gamblers and common gambling houses engaged in professional gambling; and at the same time, both to preserve the freedom of the press and to avoid restricting participation by individuals in activities and social pastimes, which activities and social pastimes are more for amusement rather than for profit, do not maliciously affect the public, and do not breach the peace."

112.    Playtika has violated RCW § 9.46.010, et seq., because Slotomania offers illegal online gambling games.

113.    Playtika's wrongful conduct occurred in the conduct of trade or commerce, namely, while Playtika was engaged in the operation of making computer games available to the public.

114.    Playtika's acts and practices were and are injurious to the public interest because Playtika, in the course of its business, continuously advertised to and

solicited the general public in Washington State and throughout the United States to play their unlawful online gambling games of chance. This was part of a pattern or generalized course of conduct on the part of Playtika, and many consumers have been adversely affected by Playtika's conduct and the public is at risk.

115.   Playtika also engaged in unfair or deceptive acts or practices under the WPCA, because the user interface in the Slotomania game incorporates undisclosed dark pattern design elements such as urgency and scarcity tactics that advertised misleading sales offers with limited time deals. These tactics are deceptive because they are designed to coerce action and manipulate users into making certain decisions in the game against their own interests, with real monetary loss to users such as the Plaintiff and other members of the Washington Class. Moreover, Playtika's implementation of dark patterns, which violate the FTC Act, also constitute a *per se* violation of the WPCA. *See* Wash. Rev. Code § 19.86.920 ("It is the intent of the legislature that, in construing this act, the courts be guided by final decisions of the federal courts and final orders of the federal trade commission interpreting the various federal statutes dealing with the same or similar matters. . .").

116.   Playtika has also engaged in unfair or deceptive acts or practices through the sale of in game items in Slotomania advertised using misleading limited-time sale offers. Playtika has violated the "unfair" prong of RCW 19.86.020 by falsely representing that sales in Slotomania contained unique, time-sensitive discounts, when, in fact, they contained the same in-game items as other packs not connected with specific sales events.

117.   Playtika has profited immensely from their operation of unlawful games of chance and related conduct, amassing billions of dollars from the losers of their games of chance.

118.   Plaintiff and putative Washington Class members acted on Playtika's omissions in that they were unaware that they had a very low likelihood of actually

obtaining any valuable reward and/or prize from their in-game purchases in Playtika's online casino.

119.   Playtika knew or should have known that their omissions regarding the in-game purchases were false, unfair, deceptive, or misleading acts or practices.

120.   As a result of Playtika's conduct, Plaintiff and the class members were injured in their business or property—i.e., economic injury—in that they lost money wagering on Playtika's unlawful games of chance.

121.   Playtika's unfair or deceptive conduct proximately caused Plaintiff's and the class members' injuries because, but for the challenged conduct, Plaintiff and the class members would not have purchased coins in Slotomania or lost money wagering at or on Playtika's games of chance, and they did so as a direct, foreseeable, and planned consequence of that conduct.

122.   Plaintiff seeks to enjoin further unfair and fraudulent acts or practices by Playtika, recover damages, and obtain all other relief allowed under Wash. Rev. Code § 19.86.010.

### THIRD CAUSE OF ACTION
**Restitution or Unjust Enrichment**
**(On behalf of Plaintiff, the National Class, and National Non-Arbitration Class)**

97.   Plaintiff repeats, realleges, and incorporates the allegations in Paragraphs 1–93 by reference as if fully set forth herein.

98.   Plaintiff and the other Class members conferred an economic benefit on Playtika through their in-game purchases.

99.   Playtika appreciates and/or has knowledge of the benefits conferred upon it by Plaintiff and the Classes.

100.   Under principles of equity and good conscience, it is inequitable and unjust for Playtika to retain the monies obtained from Plaintiff and the Classes,

which Playtika has unjustly obtained as result of its unlawful and deceptive practices in connection with Slotomania and at the expense of Plaintiff.

101.    As it stands, Playtika has retained millions of dollars in profits generated from Slotomania and should not be permitted to retain those ill-gotten profits.

102.    Accordingly, Plaintiff and the Classes seek full disgorgement and restitution of any money Playtika has retained as a result of the unlawful and/or wrongful conduct alleged herein.

## FOURTH CAUSE OF ACTION
### Negligent Misrepresentation
### (On behalf of Plaintiff, the National Class, and National Non-Arbitration Class)

103.    Plaintiff repeats, realleges, and incorporates the allegations in Paragraphs 1–93 by reference as if fully set forth herein.

104.    Playtika made a false representation as to a past or existing material fact when it represented to Plaintiff and individuals similarly situated that various in-game purchases in Slotomania were on sale and that special limited time events or "sale" versions of in game items were being offered at uniquely good values.

105.    These representations were false because the bundles and coins were routinely offered in Slotomania and were not limited in time. Accordingly, Playtika made the representations without reasonable ground for believing it to be true.

106.    Playtika designed the graphical images and verbiage on the advertisements in a way that intentionally attracted Plaintiff and those similarly situated to the enticing but false claims regarding the existence of sales.

107.    Playtika knew or should have known that the sale advertisements were false and misleading at the time they were made. Playtika profited from these false representations to consumers.

108.   Plaintiff and those similarly situated reasonably relied upon the false statements in deciding to make in-game purchases.

109.   Upon purchasing the in-game items, Plaintiff and those similarly situated were harmed because, had they known the advertised sales were false, they would not have made those purchases.

110.   Plaintiff's    and    class    members'    reliance    on    Playtika's misrepresentations in their sale advertisements was a substantial factor in causing harm to Plaintiff and those similarly situated.

111.   Playtika's conduct has caused and is causing immediate and irreparable injury to Plaintiff and those similarly situated and will continue to both damage and deceive Plaintiff and the class members unless enjoined by this Court.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully request, on her own behalf and on behalf of all others similarly situated, the following relief:

1. For an order certifying this action as a class action, defining the Classes as requested herein, appointing Plaintiff as class representatives and their counsel as class counsel;

2. Awarding Plaintiff all economic, monetary, actual, consequential, compensatory, and punitive damages available at law;

3. Awarding Plaintiff' reasonable attorneys' fees, costs, and other litigation expenses;

4. Awarding pre- and post-judgment interest, as allowable by law;

5. For public injunctive relief as the Court may deem proper; and

6. Awarding such further and other relief as the Court deems just and equitable.

## **JURY DEMAND**

Plaintiff request trial by jury of all claims that can be so tried

Dated: April 24, 2025                    Respectfully submitted,


By: */s/ Andrew Shamis*

**SHAMIS & GENTILE P.A.**

Andrew J. Shamis, Esq.
Washington Bar No. 61955
ashamis@shamisgentile.com
14 NE 1st Ave., Suite 705
Miami, Florida 33132
Telephone: 305-479-2299

*Counsel for Plaintiff and the Proposed Classes*